UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No. 22-cv-9082

LOREN M. RIDINGER, individually and
on behalf of the Estate of James Ridinger,
and MILAGRO YACHT CHARTERS, LLC,

      Plaintiffs,

vs.

RALPH K. STONE, RACHEL L. GOULD, and
MEISTER SEELIG & FEIN LLP,

      Defendants.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Loren M. Ridinger, individually and on behalf of the Estate of James Ridinger, and Milagro Yacht Charters, LLC ("Milagro") (together, "Plaintiffs"), by and through undersigned counsel, file this Complaint and Demand for Jury Trial against Defendants Ralph K. Stone, Rachel L. Gould, and Meister Seelig & Fein LLP (together, "Defendants").  As grounds for their Complaint, Plaintiffs state as follows:

### NATURE OF CLAIM

1. In this legal malpractice action, Plaintiffs seek the recovery of damages sustained as a direct result of the highly improper, self-interested, and unsound legal advice that Defendants rendered in connection with the disposition of a yacht in 2016.

2. Defendants Ralph K. Stone ("Stone") and Rachel L. Gould ("Gould") are lawyers who are licensed in the State of New York.  At the time of the events described herein, Stone and Gould practiced law at Defendant Meister Seelig & Fein LLP ("MSF"), where Stone remains a Partner.

3.	In early 2016, Plaintiff Loren M. Ridinger and her late husband James Ridinger owned a classic yacht through Plaintiff Milagro, an entity they controlled.  Upon learning the Ridingers and Milagro were considering a sale or charitable donation of the yacht, Stone and Gould, whom the Ridingers had retained as their lawyers just weeks earlier, perceived an opportunity to benefit themselves and their affiliates.  With reckless disregard and indifference to their clients' interests, and indeed subordinating those interests in favor of their own, Stone and Gould—entirely unsolicited—presented the Ridingers with an alternative transaction to the ones they had been considering.

4.	Stone and Gould proposed that the Ridingers have Milagro donate the yacht to a specific non-profit organization with which they had a preexisting relationship.  They explained that if Milagro were to make this particular donation, they would be able to facilitate the donee organization's immediate sale of the yacht, at its recently appraised value, to an entity they controlled.  Stone and Gould advised that this was a lawful way of carrying out the Ridingers' philanthropic intent while simultaneously locking in the donative value of the yacht—*i.e.*, securing the amount of the charitable deduction the Ridingers would be entitled to claim for tax purposes—which otherwise would be subject to potential change for the duration of a three-year "look-back" period.  Trusting and relying upon their lawyers, the Ridingers agreed to follow this proposal, which Defendants then implemented.

5.	Unbeknownst to the Ridingers, however, and as they would soon learn the hard way during an expensive and time-consuming multi-year audit by the Internal Revenue Service, the proposal by Stone and Gould was completely unlawful and improper, and the advice they had rendered was flat-out wrong.  The donation-and-sale that Stone and Gould had proposed, recommended, advised, and carried out did *not* lock in the donative value of the yacht, as they

had explicitly advised. The Ridingers ultimately expended millions of dollars to resolve tax liabilities arising out of Defendants' poorly conceived transaction, a resolution that was necessary to avoid the serious potential for reputational harm to which the Ridingers and their businesses had been exposed by Defendants' recklessness.

6. Moreover, Stone and Gould had structured the transaction in such a way that Milagro's donee ultimately received a mere fraction of the yacht's value, which instead appears to have inured primarily to their own benefit or the benefit of entities they controlled.

7. In short, Stone and Gould's self-interested conduct and lack of diligence in connection with the transaction, as described herein, constitute clear-cut breaches of duties that were owed to the Ridingers and Milagro as their lawyers, including the duties of care and loyalty. In this action, Plaintiffs seek to hold Defendants accountable for those inexcusable breaches and the extent of the harm they have caused, while also deterring Defendants from committing similar breaches in the future.

## THE PARTIES

8. Plaintiff Loren M. Ridinger is an individual domiciled in Miami Beach, Florida. She is the widow of James Ridinger, who died on August 31, 2022, and she is in the process of being appointed personal representative of his Estate.

9. In the 1990s, the Ridingers co-founded non-party Market America Worldwide, Inc. ("Market America"), which has since grown into a highly successful global e-commerce and digital marketing company with over 800 employees. At all times relevant to this action, James Ridinger was the company's CEO and majority shareholder, and Plaintiff Loren M. Ridinger was the company's Senior Executive Vice President and one of six minority shareholders.

10. Plaintiff Milagro Yacht Charters LLC is a Delaware limited liability company that operates exclusively in Florida. At all times relevant to this action, Milagro had the same ownership structure as Market America; James Ridinger was the company's Member-Manager and its majority owner, and Loren M. Ridinger was one of six minority owners.

11. Defendant Meister Seelig & Fein LLP is a New York limited liability partnership. MSF is a law firm that is headquartered in New York, New York, with additional offices in East Brunswick, New Jersey and Stamford, Connecticut.

12. Defendant Ralph K. Stone is an individual who, upon information and belief, is domiciled in New York, New York. Stone is a practicing transactional lawyer licensed in New York, where he is a Partner in the Real Estate Group of co-Defendant MSF.

13. Defendant Rachel L. Gould is an individual who, upon information and belief, is domiciled in New York, New York. As with Defendant Stone, Gould is a lawyer licensed in New York who, at the time of the events described herein, also practiced law at co-Defendant MFS.

## JURISDICTION AND VENUE

14. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because this case involves citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

15. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions underlying Plaintiffs' claims occurred in this District.

## **GENERAL ALLEGATIONS**

16. In 1999, Market America purchased a 1970 116-foot Feadship Motor Yacht and named it *Utopia II*.

17. Although *Utopia II* was a well-built, steel hulled yacht and was considered a classic, its carrying costs were significant. Over the years, Market America would spend millions of dollars maintaining and refitting the Yacht, which it used primarily to host seminars, conferences, and business meetings.

18. For asset protection purposes, in 2015 Market America distributed *Utopia II* to its shareholders. The shareholders then contributed their respective ownership shares to an entity called Utopia Yachting, LLC ("Utopia Yachting"). Months later, Utopia Yachting distributed the Yacht to its members, who then contributed their respective ownership shares to Milagro on January 1, 2016.

19. At all times relevant to this action, Milagro had the same ownership structure as Market America (as did Utopia Yachting). In other words, the seven members of Milagro were also the seven shareholders of Market America, and their respective ownership percentages in each entity were the same. Thus, for example, James Ridinger was the majority owner of Milagro and Plaintiff Loren M. Ridinger was a minority owner of Milagro, just as they were with Market America.

20. Even after the change in ownership, Market America continued using *Utopia II* for business purposes. As the company grew, however, it acquired other boats that served much the same function. Given its decreased utility and its cost to maintain, the Ridingers decided to consider selling the Yacht, and with the input of their team of advisors they started evaluating its potential market and salability.

21. In early 2016, the Ridingers' advisors recommended that they also consider donating *Utopia II* to an Internal Revenue Code § 501(c)(3) organization—*i.e.*, a type of tax-exempt non-profit organization.

22. The Ridingers were generally aware that if they were to have Milagro make such a donation, they would be entitled to claim a charitable deduction on their taxes, and that this would have the effect of reducing their taxable income. As the Ridingers were neither lawyers nor accountants, however, they had little to no understanding of how to lawfully effectuate and account for such a donation, and they relied upon their advisors to explain the available alternatives and the implications of each.

23. At one point, *Utopia II*'s captain suggested donating the Yacht to a specific § 501(c)(3) charitable organization called AMIKids, Inc. ("AMIKids") that is engaged in the rehabilitation of troubled youth. As the Ridingers learned about AMIKids they considered it a strong donee candidate; they learned, for example, that the organization had operated a yacht donation program for almost 50 years and had previously accepted many yacht donations to benefit its mission.

24. Meanwhile, in or around February 2016, the Ridingers were introduced to Stone by Gould, who was already a family acquaintance. Impressed with Stone's Harvard Law School credentials and his experience, the Ridingers retained Defendants to represent them in connection with general business and personal matters. Between March and June 2016, Defendants were paid more than $50,000 for their legal services.

25. In March 2016, in conjunction with and as a precondition to a potential donation of *Utopia II* to an established charity, Milagro commissioned a yacht/marine surveyor to conduct a Vessel Condition Survey of the Yacht. The surveyor valued the Yacht at $4,930,000.

26. Upon learning that the Ridingers and Milagro were considering a donation of the Yacht, Stone and Gould undertook to steer them toward a course of action that would benefit themselves and affiliated entities.

27. First, Stone caused the Ridingers to question whether the captain of *Utopia II*—*i.e.*, the individual who had recommended AMIKids as a potential donee—had coordinated without their knowledge to receive a commission from AMIKids in exchange for securing the donation. The Ridingers would later learn that this suspicion was entirely unfounded.

28. Around the same time, Stone and Gould advised the Ridingers that a three-year "look-back" period applies to the donation of personal property. This meant that if the chosen donee were to sell *Utopia II* within three years of receiving the donation, the amount of any charitable deduction claimed for tax purposes would be derived from the subsequent sale price, *not* the $4,930,000 valuation they had obtained, and in that event their tax returns would have to be amended accordingly.

29. In late March 2016, Stone and Gould proposed an alternative transaction to the ones the Ridingers had been considering. Under their proposal, Milagro would donate *Utopia II* to a § 501(c)(3) organization that they had a preexisting attorney-client relationship with called Veterans, Inc. ("Veterans"). Stone relayed that Veterans had a mission of providing vocational, medical, housing, and other services to veterans. He represented that Veterans regularly accepted donations of personal property and that he had previously worked with the organization on similar transactions.

30. Stone and Gould explained that if Milagro were to make this donation, they would arrange for Veterans to immediately sell *Utopia II* to an entity they controlled for the assessed value of $4,930,000, thereby securing the value of the donation—and thus the amount of the

Ridingers' charitable deduction.  In other words, Stone and Gould represented that their proposal was a solution to the look-back period they had raised concerns about.  Stone said the proposal would "provide an immediate tax deduction of $4.7MM" and "eliminate any risk of reduction of the deduction amount."

31. Stone and Gould advised that this donative strategy was lawful.

32. Based on the advice they received from Stone and Gould, and under their guidance, the Ridingers agreed to have Milagro donate *Utopia II* to Veterans.

33. Neither the Ridingers nor anyone else on behalf of Milagro communicated with Veterans about the donation; all communications with Veterans about the donation were handled by Stone and Gould.

34. Defendants also prepared documentation to reflect the donation for both donor and donee, including (1) a Deed of Gift from Milagro to Veterans, (2) a Form 8282 (Donee Information Return), (3) a Form 8283 (Noncash Charitable Contributions), and (4) a Form 1098-C (Contributions of Motor Vehicles, Boats, and Airplanes).

35. In May 2016, as Milagro's Member-Manager, James Ridinger executed a Deed of Gift on behalf of Milagro, pursuant to which Milagro donated *Utopia II* to Veterans.

36. Immediately upon receipt of the donation, Veterans sold *Utopia II* to an entity that had just been formed by Stone and Gould called RR Skye Holdings, LLC ("RR Skye").  In exchange, Veterans received promissory notes from RR Skye totaling $4,930,000.

37. Around the same time, Market America agreed to lend RR Skye a portion of the funds it would need to carry the operating costs of *Utopia II*.  RR Skye ultimately borrowed $400,000 from Market America, in four installments of $100,000 each, all of which were repaid with interest within the span of one year.

38.     Milagro proceeded to report a charitable deduction of $4,930,000 on its Form 1066 for 2016, which was both the appraised value of *Utopia II* and its purchase price. Based on their respective ownership interests in Milagro, and in accordance with the advice received from Stone and Gould, the Ridingers proceeded to report a charitable deduction of $4,752,164 as an itemized deduction on Schedule A of their joint federal income tax return for 2016.

39.     Veterans, however, never actually received $4,930,000 under the promissory notes it had received from RR Skye in exchange for *Utopia II*. Instead, pursuant to a "fiscal sponsorship agreement," Stone and Gould arranged for Veterans to assign a note corresponding to 90% of that purchase price to a different entity affiliated with Stone and Gould called Killer Impact, Inc.

40.     Then, in September 2017, RR Skye sold *Utopia II* to a third party for $1,300,000. Plaintiffs were not involved in that transaction and have no knowledge of the disposition of the sale proceeds, other than their understanding that Veterans received just 10% of those proceeds (*i.e.*, $130,000).

41.     Subsequently, the Internal Revenue Service conducted an audit and found that the charitable deductions claimed by the Ridingers and Milagro were improper. In other words, contrary to the explicit legal advice Stone and Gould had rendered, the donation-and-sale that Stone and Gould had proposed, recommended, advised, and carried out had *not* locked in the donative value of *Utopia II*.

42.     Based on its findings, in June 2021 the IRS alleged deficiencies of more than $3,200,000 against the Ridingers and sought to assess fraud and accuracy-based penalties of more than $1,400,000 against the Ridingers pursuant to I.R.C. §§ 6662 and 6663.

43. In or around June 2022, the Ridingers paid millions of dollars to resolve tax liabilities arising from the charges made by the IRS.

44. The Ridingers and Milagro, however, would never have proceeded with the transaction underlying the IRS audit—and therefore would never have incurred these extraordinary liabilities and the substantial expenses arising therefrom, including defense costs—had it not been for the self-interested and unsound legal advice they had received from Defendants.

45. Therefore, Plaintiffs have retained the undersigned counsel to bring this action to hold Defendants accountable for the harm they have caused.

## CAUSES OF ACTION

### COUNT I – LEGAL MALPRACTICE
(against Defendants Ralph K. Stone and Rachel L. Gould)

46. Plaintiffs restate and reallege Paragraphs 1–45 as though fully stated herein.

47. Plaintiffs formed an attorney-client relationship with Defendants Stone and Gould.

48. As a result of the attorney-client relationship, Defendants Stone and Gould owed Plaintiffs various duties, including:

> (i) *A duty of care*, which requires an attorney to have the ordinary knowledge, skill, and competence reasonably necessary to confront the circumstances of each case; and
>
> (ii) *A duty of loyalty*, which requires an attorney to provide full and fair disclosure of any actual or potential conflicts of interest.

49. Professional standards that bear on these duties and others are embodied in the New York Rules of Professional Conduct (the "Rules"), which have been adopted by the

Appellate Division of the New York State Supreme Court and which apply to lawyers licensed in New York, like Defendants Stone and Gould. Such Rules include:

(i) Rule 1.1 (*"Competence"*), which calls for lawyers to provide "competent representation," and which notes that such representation "requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation";

(ii) Rule 1.3 ("*Diligence*"), which requires lawyers to act with "reasonable diligence" in their representation;

(iii) Rule 1.4 (*"Communication"*), which requires lawyers to "explain [the] matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation";

(iv) Rule 1.7 ("*Conflicts of Interest: Current Clients*"), which prohibits lawyers from representing a client without informed, written consent if a reasonable lawyer would conclude in relevant part that "[t]here is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests"; and

(v) Rule 1.8 ("*Current Clients: Specific Conflict of Interest Rules*"), which prohibits lawyers from entering into a business transaction with a client "if they have differing interests therein and if the client expects the lawyer to exercise professional judgement therein for the protection of the client," unless certain conditions are met, including:

(1) The transaction is fair and reasonable to the client and the terms of the transaction are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

(2) The client is advised in writing of the desirability of seeking, and is given a reasonable opportunity to seek, the advice of independent legal counsel on the transaction; and

(3) The client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

50. With regard to personal-interest conflicts in particular, the commentary to the Rules add, for the avoidance of doubt, that "a lawyer *may not suggest that a gift be made to the lawyer or for the lawyer's benefit*." *See* Rule 1.8, Comment 6 (emphasis added).

51. Defendants Stone and Gould breached duties that they owed to Plaintiffs, including the duties of care and loyalty.

52. With regard to the duty of care, the advice Defendants Stone and Gould rendered to Plaintiffs was not merely incorrect, it fell far short of the ordinary knowledge, skill, and competence commonly possessed by a member of the legal community.

53. Had Defendants Stone and Gould adequately prepared themselves through a reasonably diligent factual and legal inquiry, they would have known that—contrary to their advice—following their proposal would *not* have the effect of locking in the amount of Plaintiffs' charitable deduction at the appraised/sale value of *Utopia II*.

54. With regard to the duty of loyalty, Defendants Stone and Gould represented several different interests in the transaction, and had personal conflicts of interest—indeed, they personally benefitted financially from the transaction. Defendants Stone and Gould failed to provide full and fair disclosure or obtain written, informed consent from Plaintiffs.

55. As a direct and proximate cause of the breaches and failures to adhere to applicable professional standards by Defendants Stone and Gould, Plaintiffs sustained actual damages, including but not limited to all amounts incurred by Plaintiffs in responding to and resolving the tax issues and liabilities arising from the IRS audit. Plaintiffs therefore are entitled to judgment against Defendants Stone and Gould for damages in an amount to be proven at trial.

56. Accordingly, Plaintiffs are entitled to relief as set forth in the Prayer for Relief below.

## COUNT II – BREACH OF FIDUCIARY DUTIES
### (against Defendants Ralph K. Stone and Rachel L. Gould)

57. Plaintiffs restate and reallege Paragraphs 1–45 as though fully stated herein.

58. Plaintiffs formed an attorney-client relationship with Defendants Stone and Gould.

59. As a result of the attorney-client relationship, Defendants Stone and Gould owed Plaintiffs fiduciary duties, including duties to at all times represent Plaintiffs and handle their affairs with the utmost degree of honesty, forthrightness, loyalty, and fidelity.

60. Defendants Stone and Gould breached their fiduciary duties to Plaintiffs because their representation was characterized by compromising influences and loyalties that were adverse to Plaintiffs' interests. Indeed, the advice rendered by Defendants Stone and Gould was influenced by their self-interest, which included both their personal interests in currying favor with a donee-client, and their personal interests in maximizing the subsequent sale price of *Utopia II* for the benefit of themselves and/or affiliated entities.

61. As a direct and proximate cause of the breaches and failures to adhere to applicable professional standards by Defendants Stone and Gould, Plaintiffs sustained actual damages, including but not limited to all amounts incurred by Plaintiffs in responding to and resolving the tax issues and liabilities arising from the IRS audit. Plaintiffs therefore are entitled to judgment against Defendants Stone and Gould for damages in an amount to be proven at trial.

62. Accordingly, Plaintiffs are entitled to relief as set forth in the Prayer for Relief below.

## COUNT III – VICARIOUS LIABILITY
### (against Defendant Meister Seelig & Fein LLP)

63. Plaintiffs restate and reallege Paragraphs 1–45 as though fully stated herein.

64. Defendant Stone is a New York licensed attorney who is a Partner at Defendant MSF, and who was a Partner at Defendant MSF at the time of the events described herein.

65. Defendant Gould is a New York licensed attorney who was employed by Defendant MSF at the time of the events described herein.

66. At all times material, Defendants Stone and Gould acted within the course and scope of their employment with Defendant MSF, including when Defendants Stone and Gould breached the duties that they owed to Plaintiffs by virtue of their attorney-client relationship with Plaintiffs—including their fiduciary duties and the duties of care and loyalty.

67. As such, the breaches of Defendants Stone and Gould are imputed to Defendant MSF, such that Defendant MSF is vicariously liable for those breaches.

68. Accordingly, Plaintiffs are entitled to relief as set forth in the Prayer for Relief below.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief against Defendants as follows:

A. For judgment in their favor and for an award of actual, consequential, statutory, and punitive damages against Defendants, together with pre- and post-judgment interest;

B. For reasonable attorney's fees;

C. For the costs of bringing this action and other collection costs; and

D. For all other relief that this Court deems just and proper.

Dated October 24, 2022

Respectfully submitted,

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**
One Biscayne Tower
2 S. Biscayne Blvd., Suite 2530
Miami, Florida 33131
Tel: 954-400-4261 | Fax: 866-780-8355

By: /s/ Daniel L. Rashbaum
Daniel L. Rashbaum, Esq.
New York Bar No. 4002895
drashbaum@mnrlawfirm.com

*Counsel for Plaintiffs*