# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

Case No. 22-CV-09082-VM

LOREN M. RIDINGER, individually and
on behalf of the Estate of James Ridinger,

       Plaintiff,

   vs.

RALPH K. STONE, RACHEL L. GOULD, and
MEISTER SEELIG & FEIN LLP,

      Defendants.

_____/

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Loren M. Ridinger, individually and on behalf of the Estate of James Ridinger, ("Plaintiff"), files this First Amended Complaint and Demand for Jury Trial against Defendants Ralph K. Stone, Rachel L. Gould, and Meister Seelig & Fein LLP (together, "Defendants"). As grounds for the Amended Complaint, Plaintiff states as follows:

## NATURE OF CLAIM

1.      In this action, Plaintiff Loren M. Ridinger, on behalf of herself and her late husband James Ridinger, asserts claims for malpractice, breach of fiduciary duty, and fraud against Defendants, the Ridingers' former lawyers, arising from their flawed legal advice and their deceptive and self-interested conduct in connection with the disposition of a classic yacht in 2016.

2.      Defendants Ralph K. Stone ("Stone") and Rachel L. Gould ("Gould") are lawyers who are licensed in the State of New York. At the time of the events described herein, Stone and Gould practiced law at Defendant Meister Seelig & Fein LLP ("MSF"), where Stone remains a Partner in the firm's Real Estate Group.

1

3.      In early 2016, the Ridingers owned a yacht named *Utopia II* through an entity they controlled called Milagro Yacht Charters, LLC ("Milagro").  Upon learning the Ridingers and Milagro were considering a potential sale or charitable donation of the yacht, Stone and Gould, whom the Ridingers had retained as their lawyers just weeks earlier to handle general personal and business matters, perceived an opportunity to benefit themselves and their affiliates. Subordinating the Ridingers' interests for their own, Stone and Gould—entirely unsolicited— presented the Ridingers with an alternative transaction to the ones they had been considering.

4.      Stone and Gould proposed that the Ridingers have Milagro donate the yacht to a specific non-profit organization with which they had a preexisting relationship.  They explained that if Milagro were to make this particular donation, they would be able to facilitate the donee organization's immediate sale of the yacht at its recently appraised value to an entity they controlled.  Stone and Gould advised that this was a lawful way of carrying out the Ridingers' philanthropic intent while simultaneously locking in the donative value of the yacht—*i.e.*, securing the amount of the charitable deduction the Ridingers would be entitled to claim for tax purposes— which otherwise would be subject to potential change for the duration of a three-year "look-back" period.

5.      Having been told by the Ridingers that kickbacks or side deals of any kind were a dealbreaker for them and would not be tolerated, Stone and Gould explicitly represented that they did not stand to benefit in any way from the proposal they had outlined, and that their sole intention was to help the Ridingers understand and evaluate their alternatives and lawfully effectuate whatever transaction the Ridingers ultimately deemed to be in their best interest.

6.      Trusting and relying upon their lawyers, the Ridingers agreed to follow Defendants' proposal, which Defendants then implemented entirely on their own.

7.     Unbeknownst to the Ridingers, however, the proposal by Stone and Gould was completely unlawful and improper, and the advice they had rendered was flat-out wrong.  The donation-and-sale that Stone and Gould had proposed, recommended, advised, and carried out did *not* lock in the donative value of the yacht, as they had explicitly advised.

8.     Worse, during the course of an expensive and time-consuming multi-year audit by the Internal Revenue Service, the Ridingers learned not only that Defendants' advice was wrong, but that Stone and Gould had purposefully deceived them from the outset.  Notwithstanding their assurances that they would not benefit from the transaction, Stone and Gould had surreptitiously structured the transaction in such a way that the Ridingers' intended donee ultimately received a mere fraction of the yacht's value when it was sold the year after the donation, at which time the substantial sale proceeds flowed primarily to Stone, Gould, and/or their affiliated entities.  In other words, Stone and Gould had lied to the Ridingers in order to induce them to pursue a specific transaction through which they would personally benefit.

9.     The Ridingers ultimately expended millions of dollars to resolve tax liabilities—including both fraud and accuracy-based penalties that the IRS sought to assess—arising out of Defendants' poorly conceived transaction, a resolution that was necessary to avoid the serious potential for reputational harm to which the Ridingers and their businesses had been exposed by Defendants' misconduct.

10.     In short, the Ridingers suffered millions of dollars in damages as a result of Stone and Gould's flawed legal advice.  Moreover, Stone and Gould induced the Ridingers to enter into the underlying donation of *Utopia II* through misrepresentations about the transaction and its purpose.  In this action, Plaintiff seeks to hold Defendants accountable for their inexcusable

conduct and the extent of the harm they have caused, while also deterring Defendants from engaging in similar conduct in the future.

## **THE PARTIES**

11.     Plaintiff Loren M. Ridinger is an individual domiciled in Miami Beach, Florida. She is the widow of James Ridinger, who died on August 31, 2022, and she was appointed personal representative of his Estate on November 23, 2022.  *See* **Exhibit A**.

12.     In the 1990s, the Ridingers co-founded non-party Market America Worldwide, Inc. ("Market America"), which has since grown into a highly successful global e-commerce and digital marketing company with over 800 employees.  At all times relevant to this action, James Ridinger was the company's CEO and majority shareholder, and Plaintiff Loren M. Ridinger was the company's Senior Executive Vice President and one of six minority shareholders.

13.     Defendant Meister Seelig & Fein LLP is a New York limited liability partnership. MSF is a law firm that is headquartered in New York, New York, with additional offices in East Brunswick, New Jersey and Stamford, Connecticut.

14.     Defendant Ralph K. Stone is an individual who, upon information and belief, is domiciled in New York, New York.  Stone is a practicing transactional lawyer licensed in New York, where he is a Partner in the Real Estate Group of co-Defendant MSF.

15.     Defendant Rachel L. Gould is an individual who, upon information and belief, is domiciled in New York, New York.  As with Defendant Stone, Gould is a lawyer licensed in New York who, at the time of the events described herein, also practiced law at co-Defendant MFS.

## JURISDICTION AND VENUE

16.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because this case involves citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

17.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions underlying Plaintiff's claims occurred in this District.

## GENERAL ALLEGATIONS

18.     In 1999, Market America purchased a 1970 116-foot Feadship Motor Yacht and named it *Utopia II*.

19.     Although *Utopia II* was a well-built, steel hulled yacht and was considered a classic, its carrying costs were significant.  Over the years, Market America would spend millions of dollars maintaining and refitting the Yacht, which it used primarily to host seminars, conferences, and business meetings.

20.     For asset protection purposes, in 2015 Market America distributed *Utopia II* to its shareholders.  The shareholders then contributed their respective ownership shares to an entity called Utopia Yachting, LLC ("Utopia Yachting").  Months later, Utopia Yachting distributed the Yacht to its members, who then contributed their respective ownership shares to Milagro on January 1, 2016.

21.     At all times relevant, Milagro had the same ownership structure as Market America (as did Utopia Yachting).  In other words, the seven members of Milagro were also the seven shareholders of Market America, and their respective ownership percentages in each entity were

5

the same. Thus, for example, James Ridinger was the majority owner of Milagro and Plaintiff Loren M. Ridinger was a minority owner of Milagro, just as they were with Market America.

22. Even after the change in ownership, Market America continued using *Utopia II* for business purposes. Over time, however, it became redundant given the company's acquisition of another yacht called *Utopia III* that served much the same function and, later, given its commissioning of a much larger yacht called *Utopia IV*.

23. Given its decreased utility and its cost to maintain, the Ridingers decided to consider selling *Utopia II*, and with the input of their team of advisors they started evaluating its potential market and salability.

24. In early 2016, the Ridingers' advisors recommended that they also consider donating *Utopia II* to an Internal Revenue Code § 501(c)(3) organization—*i.e.*, a type of tax-exempt non-profit organization.

25. The Ridingers were generally aware that if they were to have Milagro make such a donation, they would be entitled to claim a charitable deduction on their taxes, and that this would have the effect of reducing their taxable income. As the Ridingers were neither lawyers nor accountants, however, they had little to no understanding of how to lawfully effectuate and account for such a donation, and they relied upon their advisors to explain the available alternatives and the implications of each.

26. At one point, *Utopia II*'s captain suggested donating the Yacht to a specific § 501(c)(3) charitable organization called AMIKids, Inc. ("AMIKids") that is engaged in the rehabilitation of troubled youth. As the Ridingers learned about AMIKids they considered it a strong donee candidate; they learned, for example, that the organization had operated a yacht

donation program for almost 50 years and had previously accepted many yacht donations to benefit its mission.

27. Meanwhile, in or around February 2016, the Ridingers were introduced to Stone by Gould, who was already a family acquaintance. The Ridingers retained Defendants to represent them in connection with general business and personal matters. Defendants were paid a monthly flat fee pursuant to a general retainer agreement.

28. In March 2016, in conjunction with and as a precondition to a potential donation of *Utopia II* to an established charity, Milagro commissioned a yacht/marine surveyor to conduct a Vessel Condition Survey of the Yacht. The surveyor valued the Yacht at $4,930,000.

29. Upon learning that the Ridingers and Milagro were considering a donation of the Yacht, Stone and Gould deliberately undertook to steer them toward a course of action that would benefit themselves and affiliated entities.

30. First, Stone caused the Ridingers to question whether the captain of *Utopia II*—*i.e.*, the individual who had recommended AMIKids as a potential donee—had coordinated without their knowledge to receive a kickback from AMIKids in exchange for securing the donation. The Ridingers would later learn that this suspicion was entirely unfounded.

31. Around the same time, Stone and Gould advised the Ridingers that a three-year "look-back" period applies to the donation of personal property. This meant that if the chosen donee were to sell *Utopia II* within three years of receiving the donation, the amount of any charitable deduction claimed for tax purposes would be derived from the subsequent sale price, *not* the $4,930,000 valuation they had obtained, and in that event their tax returns would have to be amended accordingly.

32.     In late March 2016, Stone and Gould proposed an alternative transaction to the ones the Ridingers had been considering. Under their proposal, Milagro would donate *Utopia II* to a § 501(c)(3) organization that they had a preexisting attorney-client relationship with called Veterans, Inc. ("Veterans"). Stone relayed that Veterans had a mission of providing vocational, medical, housing, and other services to veterans. He represented that Veterans regularly accepted donations of personal property and that he had previously worked with the organization on similar transactions.

33.     Stone and Gould explained that if Milagro were to make this specific donation, they would arrange for Veterans to immediately sell *Utopia II* to an entity they controlled for the assessed value of $4,930,000, thereby securing the value of the donation—and thus the amount of the Ridingers' charitable deduction. They advised that Veterans had approved of the valuation amount and, unlike other potential donees, would not require a costly survey to be conducted as a condition of the donation.

34.     In other words, Stone and Gould represented that their proposal was a solution to the look-back period they had raised concerns about. Stone said the proposal would "provide an immediate tax deduction of $4.7MM" and "eliminate any risk of reduction of the deduction amount." Gould similarly said that the immediate purchase "will remove any concerns regarding the 3-year wait period."

35.     Stone and Gould advised that the donative strategy they had outlined—whereby *Utopia II* would be donated to Veterans and then immediately sold to an entity they controlled— was lawful.

36.     Moreover, Mr. Ridinger had made Stone and Gould aware that he had no tolerance for side deals or kickbacks, saying in writing that "[w]e have to make sure that no one working for

us directly or indirectly is getting a commission or kick back!" Knowing the Ridingers had abandoned the AMIKids transaction based in large part on the concern Stone had raised about whether such a kickback had in fact been arranged for that potential transaction, Stone and Gould distinguished their proposal from the AMIKids transaction; they represented that they would not be benefitting from the transaction in any way.

37.    Regrettably, this representation would turn out to be a lie. But having no reason to distrust their lawyers, the Ridingers agreed to have Milagro donate *Utopia II* to Veterans based on the explicit advice and representations they had received from Stone and Gould.

38.    Neither the Ridingers nor anyone else on behalf of Milagro communicated with Veterans about the donation; all communications with Veterans about the donation were handled by Stone and Gould.

39.    Defendants also prepared documentation to reflect the donation for both donor and donee, including (1) a Deed of Gift from Milagro to Veterans, (2) a Form 8282 (Donee Information Return), (3) a Form 8283 (Noncash Charitable Contributions), and (4) a Form 1098-C (Contributions of Motor Vehicles, Boats, and Airplanes).

40.    In May 2016, as Milagro's Member-Manager, Mr. Ridinger executed a Deed of Gift on behalf of Milagro, pursuant to which Milagro donated *Utopia II* to Veterans.

41.    Immediately upon receipt of the donation, consistent with Defendants' proposal, Veterans sold *Utopia II* to an entity that had just been formed by Stone and Gould called RR Skye Holdings, LLC ("RR Skye"). In exchange, Veterans received promissory notes from RR Skye totaling $4,930,000.

42.    Around the same time, Market America agreed to lend RR Skye a portion of the funds it would need to carry the operating costs of *Utopia II*. RR Skye ultimately borrowed

$400,000 from Market America, in four installments of $100,000 each, all of which were repaid with interest within the span of one year.

43.     In accordance with the advice received from Stone and Gould, Milagro proceeded to report a charitable deduction of $4,930,000 on its Form 1066 for 2016, which was both the appraised value of *Utopia II* and its purchase price.  Accordingly, based on their respective ownership interests in Milagro, the Ridingers proceeded to report a charitable deduction of $4,752,164 as an itemized deduction on Schedule A of their joint federal income tax return for 2016.

44.     In the years that followed, Stone continued to represent and advise the Ridingers—not only on various unrelated matters, but also in connection with the same matter.  Indeed, from the outset of his involvement in the *Utopia II* transaction, Stone understood that the donation was the first step of a multi-part plan to dispose of both *Utopia II* and then *Utopia III* in anticipation of the completion of *Utopia IV*.  That understanding was reflected in Stone's written proposal, in which he conveyed that one of its supposed benefits was that the Ridingers "would also have the right to offer the use of Utopia II to a purchaser of Utopia III prior to the delivery of Utopia IV."  Consistent with that understanding, once *Utopia II* was donated, Stone proceeded to advise the Ridingers in connection with their donation of *Utopia III* to a different § 501(c)(3) organization—a donation that was not completed until early 2020.

45.     In 2019, the Internal Revenue Service ("IRS") commenced an audit of Milagro.  During the course of that audit, the Ridingers learned that the donative structure that had been implemented for *Utopia II* was a focus of the audit.  It was not until Mr. Ridinger was interviewed by the IRS on January 25, 2021, however, that the Ridingers learned for the first time that they had been deceived by Stone and Gould.

46.    Through that interview of Mr. Ridinger, the Ridingers learned that—directly contrary to what Stone and Gould had represented to them—when all was said and done, Veterans had received just $130,000 in the transaction.  That amount was not only a mere fraction of the appraised value of the Yacht (*i.e.*, $4,930,000), it was just 10% of what the Ridingers learned was the purchase price that RR Skye ultimately received upon selling the Yacht in September 2017 (*i.e.*, $1,300,000).  The Ridingers were not involved in that subsequent sale, and they had been unaware of any details of the sale, including the sale price.

47.    Moreover, it was not until the IRS audit, at or around the time of Mr. Ridinger's interview, that the Ridingers learned key details about the mechanics of the *Utopia II* donation that Stone and Gould had purposefully concealed from them—details that made clear how Stone and Gould had made themselves and their affiliated entities the primary beneficiaries of the donation: Although Veterans had received promissory notes from RR Skye totaling $4,930,000 at the time of the donation, RR Skye never made any payments under those notes.  Instead, pursuant to a "fiscal sponsorship agreement," Stone and Gould had then turned around and arranged for Veterans to assign a note corresponding to 90% of the purchase price to *another* entity affiliated with them called Killer Impact, Inc. ("Killer Impact").

48.    Stone and Gould purposefully kept this information from the Ridingers when advising and carrying out the donation because it would have revealed that Veterans—like the Ridingers, themselves—was merely a pawn in Defendants' carefully crafted scheme to benefit themselves.

49.    The IRS ultimately determined that the donation-and-sale did *not* lock in the donative value of *Utopia II* for tax deduction purposes.  In June 2021, the IRS alleged deficiencies

of more than $3,200,000 against the Ridingers and sought to assess fraud and accuracy-based penalties of more than $1,400,000 against the Ridingers pursuant to I.R.C. §§ 6662 and 6663.

50.     In tax court filings relating to the Ridingers' tax liabilities, the IRS alleged that Stone and Gould were involved in "plan[ning] a fraudulent transaction to dispose of the Utopia II." The IRS, however, failed to appreciate that the Ridingers were actually victims of the deceit being alleged, and that the Ridingers' were only just learning about their lawyers' deceit in connection with the audit.

51.     In or around June 2022, the Ridingers agreed to a settlement under which they would pay millions of dollars to resolve tax liabilities arising from the charges made by the IRS. The settlement was entered by the Tax Court in July 2022.

52.     Thus, in summary, not only were Stone and Gould flat-out wrong about the propriety of the strategy they had proposed, strenuously advocated for, and carried out, but as the Ridingers would learn only in late January 2021, their entire strategy had been motivated from the outset by a desire to enrich *themselves*, and not by any desire to advise and help effectuate a lawful transaction on behalf of the Ridingers.

53.     Had it not been for the malpractice of Stone and Gould, the Ridingers never would have incurred the extraordinary tax liabilities and the substantial expenses, including defense costs, arising from the IRS audit. But had it not been for the deception of Stone and Gould and the lies that induced the Ridingers to pursue the underlying donation, not only would the Ridingers not have incurred all of those audit-related liabilities and expenses, they never would have proceeded with the Veterans transaction in the first place and therefore also would not have been defrauded out of the Yacht.

54. Therefore, Plaintiff has retained the undersigned counsel to bring this action to hold Defendants accountable for the harm they have caused.

## CAUSES OF ACTION

### COUNT I – LEGAL MALPRACTICE
### (against Defendants Ralph K. Stone and Rachel L. Gould)

55. Plaintiff restates and realleges Paragraphs 1–54 as though fully stated herein.

56. The Ridingers formed an attorney-client relationship with Defendants Stone and Gould.

57. As a result of the attorney-client relationship, Defendants Stone and Gould owed the Ridingers various duties, including duties of care and loyalty.

58. These duties impose upon lawyers a duty to have the ordinary knowledge, skill, and competence reasonably necessary to confront the circumstances of each case, and to provide full and fair disclosure of any actual or potential conflicts of interest.

59. Defendants Stone and Gould breached these duties because the advice they rendered to the Ridingers was not merely incorrect, it fell far short of the ordinary knowledge, skill, and competence commonly possessed by a member of the legal community.

60. Had Defendants Stone and Gould adequately prepared themselves through a reasonably diligent factual and legal inquiry, they would have known that—contrary to their advice—following their proposal would *not* have the effect of locking in the amount of the Ridingers' charitable deduction at the appraised/sale value of *Utopia II*.

61. As a direct and proximate cause of the breaches and failures to adhere to applicable professional standards by Defendants Stone and Gould, Plaintiff sustained actual and consequential damages, including but not limited to all amounts the Ridingers incurred in responding to and resolving the tax issues and liabilities arising from the IRS audit. Plaintiff

therefore is entitled to judgment against Defendants Stone and Gould for damages in an amount to be proven at trial.

62. Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

## COUNT II – BREACH OF FIDUCIARY DUTIES
### (against Defendants Ralph K. Stone and Rachel L. Gould)

63. Plaintiff restates and realleges Paragraphs 1–54 as though fully stated herein.

64. The Ridingers formed an attorney-client relationship with Defendants Stone and Gould.

65. As a result of the attorney-client relationship, Defendants Stone and Gould owed the Ridingers fiduciary duties, including duties to at all times represent the Ridingers and handle their affairs with the utmost degree of honesty, forthrightness, loyalty, and fidelity.

66. Stone and Gould breached these fiduciary duties because their representation was characterized by dishonesty, deception, and compromising influences and loyalties that were adverse to the Ridingers' interests.

67. Specifically, while Defendants Stone and Gould purported to act on behalf and for the benefit of the Ridingers, the unsolicited donation-and-sale strategy for *Utopia II* that Stone and Gould proposed, recommended, and carried out was at all times motivated by their *own* financial interests, and *not* the Ridingers' interests.

68. Indeed, Defendants Stone and Gould induced the Ridingers to agree to the proposed strategy by falsely representing not only that the strategy was lawful (which, as the Ridingers would later learn, it was not), but that Stone and Gould would not personally benefit from the proposed transaction in any way. Stone and Gould knew this consideration was important to the Ridingers given their knowledge of the Ridingers' philanthropic intent and that the Ridingers had no tolerance for side deals or kickbacks.

69.     In explaining and then effectuating the strategy, Defendants Stone and Gould concealed key aspects about the mechanics of the transaction and its ultimate beneficiaries, including that the Ridingers' intended donee received just a fraction of *Utopia II's* ultimate sale price, which instead inured to the benefit of Stone, Gould, and/or their affiliated entities.

70.     The Ridingers never would have pursued the strategy proposed by Defendants Stone and Gould had they known the true nature of the proposed transaction and the manner in which Stone and Gould intended to—and did—subordinate the Ridingers' interests for their own.

71.     As a direct and proximate cause of Defendants' breaches of their fiduciary duties, Plaintiff sustained actual and consequential damages, including not only all amounts the Ridingers incurred in responding to and resolving the tax issues and liabilities arising from the IRS audit, but also the loss of the value of the Yacht, which the Ridingers would not have donated as advised had they not been purposefully misled.  Plaintiff therefore is entitled to judgment against Defendants Stone and Gould for damages in an amount to be proven at trial.

72.     Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

## COUNT III – FRAUD
### (against Defendants Ralph K. Stone and Rachel L. Gould)

73.     Plaintiff restates and realleges Paragraphs 1–54 as though fully stated herein.

74.     As the Ridingers' lawyers, Defendants Stone and Gould proposed a donation-and-sale strategy for *Utopia II.*

75.     Stone and Gould represented that their proposed strategy was a lawful way to lock in the donative value of the Yacht for tax deduction purposes.

76.     In connection with that strategy, Defendants Stone and Gould represented to the Ridingers that they would not benefit from the proposed transaction in any way, and that, to the

15

contrary, their sole motivation was to advise the Ridingers about their lawful alternatives and help effectuate their philanthropic intent.

77.     These representations by Defendants Stone and Gould were false, and Stone and Gould knew of their falsity at the time they were made.

78.     In reality, unknown to the Ridingers, Defendants Stone and Gould had purposefully conceived of a specific transaction in which *they*—and *not* the supposed "donee" candidate that they proposed—would ultimately be the primary beneficiaries of the Ridingers' valuable donation.

79.     Defendants Stone and Gould made these false representations, and purposefully concealed key details about the mechanics of the transaction that would have revealed their true intent and the falsity of their representations, in order to induce the Ridingers to pursue the strategy they had proposed.

80.     Indeed, in order to discourage the Ridingers from pursuing a sale or a different donative opportunity, Defendant Stone even raised supposed concerns that the individual who had recommended a different donative opportunity had arranged a kickback for himself.

81.     The Ridingers justifiably relied upon the false representations and omissions by Defendants Stone and Gould when deciding to pursue the strategy they had recommended.

82.     As a direct and proximate cause of the deception by Defendants Stone and Gould, Plaintiff sustained actual and consequential damages, including not only all amounts the Ridingers incurred in responding to and resolving the tax issues and liabilities arising from the IRS audit, but also the loss of the value of the Yacht, which the Ridingers would not have donated as advised had they not been purposefully misled.  Plaintiff therefore is entitled to judgment against Defendants Stone and Gould for damages in an amount to be proven at trial.

83.     Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

## COUNT IV – VICARIOUS LIABILITY
### (against Defendant Meister Seelig & Fein LLP)

84.     Plaintiff restates and realleges Paragraphs 1–54 as though fully stated herein.

85.     Defendant Stone is a New York licensed attorney who is a Partner at Defendant MSF, and who was a Partner at Defendant MSF at the time of the events described herein.

86.     Defendant Gould is a New York licensed attorney who was employed by Defendant MSF at the time of the events described herein.

87.     At all times material, Defendants Stone and Gould acted within the course and scope of their employment with Defendant MSF, including when Stone and Gould breached the duties that they owed to the Ridingers as their lawyers and engaged in fraudulent conduct in order to induce the Ridingers to pursue a donative opportunity that would benefit themselves.

88.     As such, the conduct of Defendants Stone and Gould is imputed to Defendant MSF, such that Defendant MSF is vicariously liable for the harm caused by their conduct.

89.     Accordingly, Plaintiff is entitled to relief as set forth in the Prayer for Relief below.

### <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

### <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays for relief against Defendants as follows:

A.     For judgment in her favor and for an award of actual, consequential, statutory, and punitive damages against Defendants, together with pre- and post-judgment interest;

B.     For reasonable attorney's fees;

C.     For the costs of bringing this action and other collection costs; and

D.     For all other relief that this Court deems just and proper.

17

Dated January 20, 2023


Respectfully submitted,


**MARCUS NEIMAN RASHBAUM &
PINEIRO LLP**

By:  _/s/ Jeffrey A. Neiman_____

Daniel L. Rashbaum, Esq.
New York Bar No. 4002895
drashbaum@mnrlawfirm.com
Tel: 305-400-4261
Fax: 866-780-8355

One Biscayne Tower
2 S. Biscayne Blvd., Suite 2530
Miami, Florida 33131

&

Jeffrey A. Neiman, Esq.
*Admitted Pro Hac Vice*
jneiman@mnrlawfirm.com
Tel: 954-541-8281
Fax: 954-688-2492

Jason L. Mays, Esq.
*Admitted Pro Hac Vice*
jmays@mnrlawfirm.com
Tel: 305-434-4941
Fax: 954-688-2492

One Financial Plaza
100 SE 3rd Ave., Suite 805
Ft. Lauderdale, Florida 33394

*Counsel for Plaintiff*

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-005140-CP-02
SECTION: PMH03
JUDGE: Bertila Soto

**IN RE: Ridinger, James Howard**

Decedent

_____/

### ORDER APPOINTING PERSONAL REPRESENTATIVE

On the petition of LOREN RIDINGER for administration of the above estate ("Estate"), the Court finding that the Decedent died on August 30, 2022, and that LOREN RIDINGER is entitled to appointment as personal representative by reason of being the Decedent's surviving spouse and pursuant to an Agreed Order entered by the Court on November 23, 2022, and is qualified to be personal representative ("Personal Representative"), it is

ADJUDGED that LOREN RIDINGER is appointed Personal Representative of the Decedent's Estate, and that upon taking the prescribed oath, filing designation of resident agent and acceptance, and entering into bond in the sum of $0, Letters of Administration shall be issued.

This Order is subject to the following restrictions:

1. This Estate must be closed within 12 months, unless it is contested or its closing date is extended by court order.

2. Unless a bond has been issued and approved by this Court, the Personal Representative(s) shall place all liquid assets in a depository designated by the Court pursuant to section 69.031, Florida Statutes ("Depository"). This is a frozen account. No funds can be withdrawn without a court order.

3. If Florida real estate is sold, per court order, a closing statement shall be filed, and the sale's net proceeds shall be placed in the Depository.

4. The Attorney of Record shall file receipt of assets by the Depository within thirty days from the issuance of the Letters of Administration.

5. There shall be no sale, encumbrance, borrowing, or gifting of any assets without a court order.

**Exhibit A**

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 23rd day of November, 2022.

2022-005140-CP-02 11-23-2022 3:16 PM
Hon. Bertila Soto

**CIRCUIT COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Ashley Crispin Ackal, acrispinackal@ocalawyers.com
Brian M O'Connell, service@OCAlawyers.com
Brian M O'Connell, tdodson@OCAlawyers.com
Christine A Schafer, christine@llfplan.com
Roselvin Sanchez Edelman, roselvin.edelman@bipc.com
Roselvin Sanchez Edelman, elizabeth.garciga@bipc.com
Roselvin Sanchez Edelman, eservice@bipc.com

**Physically Served:**